**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL FEELER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>DELTA DENTAL OF ILLINOIS,<br><br>*Defendant.* | Case No. 1:24-cv-9637 |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Michael Feeler, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Delta Dental of Illinois ("Delta Dental") to put an end to its unlawful disclosure of Plaintiff's and the proposed Class's protected health information. Upon personal knowledge as to Plaintiff's own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, Plaintiff complains and alleges as follows:

### NATURE OF THE ACTION

1. This is a class action against Delta Dental for violating Plaintiff's privacy rights by disclosing Plaintiff's and other Delta Dental plan members' personally identifiable information ("PII") and non-public personal health information ("PHI" and with PII, "Private Information") through the use of hidden tracking codes integrated by Delta Dental into Delta Dental's web properties, https://www.deltadentalil.com/ and its healthcare portal https://my.deltadentalcoversme.com/ (the "Websites").

2. Specifically, in order to gain additional insights into its plan members, improve its return on its marketing spend and, ultimately, to increase its revenue, Delta Dental encouraged

1

Plaintiff and Class Members to access and to use various digital tools via its Websites in order to, among other things, find dentists within their particular insurance plan.

3. Plaintiff and Class Members who visited and used Defendant's Websites understandably thought they were communicating *only* with their trusted health plan.

4. Unbeknownst to Plaintiff and Class Members, however, Defendant embeds certain tracking technologies on its Websites—including tracking technologies offered by the social media company LinkedIn and the online advertising company Google—that automatically transmits to the service technology providers (*i.e.*, LinkedIn and Google) confidential details about Delta Dental's plan members.

5. Operating as designed and as implemented by Defendant, the tracking technologies at issue in this case allowed the Private Information that Plaintiff and Class Members provided to Defendant to be unlawfully disclosed to LinkedIn and Google alongside unique and persistent identifiers that identify the plan member in a manner that violates federal and Illinois law.

6. By installing the tracking technologies, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive and confidential health-related data and communications with Defendant to LinkedIn and Google. Those communications include plan member requests that identify (a) the Delta Dental plan member as a Delta Dental plan member, and (b) that they were seeking treatment for oral healthcare from dentists.

7. This type of Private Information is, in turn, simultaneously intercepted by LinkedIn and Google who uses it to create fulsome and robust profiles for the purposes of retargeting and future marketing, among other business purposes that benefit the third-party service provider.

8. Plan members simply do not anticipate that their trusted health plan sends personal

health information or confidential medical information collected via its Websites to any undisclosed third party without the plan members' informed and express consent.

9.      Neither Plaintiff nor any other Class Member were provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to LinkedIn or Google or any third-party service provider.

10.     Despite willfully and intentionally incorporating the tracking technologies into its Websites and servers, Defendant has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with LinkedIn and Google.[1]

11.     Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to LinkedIn and Google as they communicated with Defendant via its Websites so it could be used for targeted advertising and marketing purposes.

12.     The disclosure of Plaintiff's and Class Members' Private Information via tracking technologies contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how covered

---

[1] In contrast to Defendant, several medical providers which have installed similar tracking technologies on their web properties have provided their plan members with notices of data breaches caused by the technology transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, available at https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited Aug. 28, 2024); *Advocate Aurora says 3M plan members' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited Aug. 28, 2024); *Novant Health notifies plan members of potential data privacy incident* (Aug. 19, 2022), available at https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html (last visited Aug. 28, 2024).

entities, such as health plans, must safeguard and protect Private Information.

13. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are ***not*** permitted to use tracking technology tools in a way that exposes plan members' Private Information to any third-party without express and informed consent and written authorization from each patient.

14. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[2]***

15. Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that plan members exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

16. Defendant has not disclosed to Plaintiff or Class Members that it shares plan members' sensitive and confidential communications with LinkedIn and Google.

---

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 28, 2024) (emphasis added).

17. As a result, Plaintiff and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to LinkedIn and Google as they communicated with their health plan.

18. Delta Dental breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the Websites were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to LinkedIn and Google; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the tracking technologies; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor its Websites to maintain the confidentiality and integrity of patient PII and PHI.

19. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct; these injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) compromise and disclosure of Private Information and identities, (iv) loss of value of their Private Information, (iv) violations of statutory rights and related statutory damages, and (v) the continued and ongoing risk to their Private Information, as the exposed Private Information of Plaintiff and Class Members can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting.

20. Plaintiff, on behalf of himself and all others similarly situated, now asserts claims under the federal Electronic Communications Privacy Act ("ECPA"), the Illinois' Eavesdropping Statute, the Illinois' consumer protection statutes, and Illinois common law, seeking damages and an injunction to stop this unlawful data sharing.

**PARTIES**

21. Plaintiff Michael Feeler is a resident of Sullivan, Illinois. Plaintiff Feeler has dental insurance through Delta Dental. In 2024, Plaintiff used a Chrome browser on his computer to search for a dentist that was covered in his Delta Dental insurance network by using www.deltadentalil.com. In 2024, Plaintiff used a Chrome browser on his computer and logged into Delta Dental's healthcare portal and searched for a dentist that was covered in his Delta Dental insurance network by using https://my.deltadentalcoversme.com/. Plaintiff Feeler had LinkedIn and Google accounts when Plaintiff searched for a dentist on www.deltadentalil.com and https://my.deltadentalcoversme.com/. Through the systematic data sharing process described in this complaint, Plaintiff Feeler's search for a dentist was disclosed to LinkedIn and Google. Plaintiff Feeler did not consent to these disclosures. Plaintiff Feeler would not have searched for a dentist through Delta Dental online had he known that his personal data was disclosed to third parties. After Plaintiff Feeler searched for a dentist through Delta Dental online, he received advertisements for Delta Dental and other insurance providers.

22. Delta Dental of Illinois is a dental services plan that is headquartered in Illinois at 111 Shuman Boulevard, Naperville, IL 60563.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises, in part, under the laws of the United States. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are based on a common nucleus of operative facts (*i.e.*, the exact same tracking technologies and disclosures), and form part of the same case or controversy, as Plaintiff's claims under federal law.

24. This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and a substantial portion of the acts and omissions giving rise to

6

Plaintiff's claims occurred in and emanated from this District.

25. Venue is proper under 18 U.S.C § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## COMMON FACTUAL ALLEGATIONS

**I.** *Defendant Improperly Disclosed Plaintiff's & Class Members' Private Information.*

26. Delta Dental offers dental health insurance to Illinois residents.

27. Defendant's Websites are accessible on mobile devices and desktop computers.

28. Defendant utilized tracking technologies that it installed on its Websites.

29. Through seeking and using Defendant's services, and utilizing the Websites' services, Plaintiff's and Class Members' Private Information was intercepted in real time and then disseminated to LinkedIn and Google (herein, the "Tracking Technology Vendors"), and potentially to other third parties, via the tracking technologies that Defendant surreptitiously installed on its Websites.

30. Plaintiff and Class Members did not intend or have any reason to suspect their Private Information would be shared with the Tracking Technology Vendors or that Defendant was tracking the dentists they were seeking within their insurance plan on their Websites and disclosing the same and other confidential details to the Tracking Technology Vendors.

31. Defendant did not disclose to or warn Plaintiff or Class Members that Defendant used the Private Information contained in Plaintiff's and Class Members' Website requests for marketing purposes.

32. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information.

7

33. Upon information and belief, Defendant assisted the interception of and disclosed the following non-public private information to the Tracking Technology Vendors:

    a. Plaintiff's and Class Members' status as plan members;

    b. Plaintiff's and Class Members' communications with Defendant through its Websites;

    c. Plaintiff's and Class Members' need for dental services, the type of dentist (e.g., general or a specialist), the insurance plan type, and the location of the patient (among other confidential details about their healthcare provider);

    d. Personally identifiable information including but not limited to plan members' locations, an IP address, device identifier and/or an individual's unique and persistent identifier LinkedIn can use to perform a "probabilistic match" to Plaintiff's real-world identity and/or an individual's unique and persistent identifier or identifiers that Google can use to identify Plaintiff and Class Members in the real world.

34. Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online plan members' confidential communications and Private Information; (ii) disclosed plan members' protected information to the Tracking Technology Vendors—unauthorized third-parties; and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

## II. *Background on Web Browsers, Source Code, & Tracking Technologies.*

35. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

36. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

37. The set of instructions that commands the browser is called the source code.

38. Source code may also command a web browser to send data transmissions to third parties via technologies that effectively open a spying window through which a website funnels data about users and their actions to third parties.

39. Tracking technologies are installed by web developers on pages of the websites they host that are run on the host's servers.

40. The third parties to whom the website transmits data through scripts do not provide any substantive content relating to the user's communications. Instead, these third-party tracking technologies are typically configured to track user data and communications for marketing purposes.

41. Thus, without any knowledge, authorization, or action by a user, a website developer like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' personally identifiable non-public medical information and communications to third party technology vendors.

42. When a user accesses a website hosting a tracking tool, the tracking tool software scripts surreptitiously direct the user's browser to send a separate message to the third-party technology provider.

43. This second, secret transmission contains the original requests exchanged with the host website (called a "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect.

44. The original GET and POST requests include the webpage's Universal Resource

9

Locator ("URL") and metadata, including IP address.

45. This transmission is initiated by a tracking tool's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the host website—the host's own code, and a tracking tool's embedded code.

46. Once the third-party technology vendor collects the information contained in the original GET and POST requests sent to the host website, the third-party can store and use the information for various business purposes of their own, including targeted advertising.

III. *How Delta Dental Discloses Class Members' Protected Health Information and Assists with Intercepting Communications.*

    A. *How Delta Dental Discloses Class Members' Protected Health Information and Assists with Intercepting Communications on www.deltadentalil.com*

47. Delta Dental maintains the web property www.deltadentalil.com for its health plan members to communicate with Delta Dental, including but not limited to exchanging communications about dentists that are in Delta Dental's network.

48. Delta Dental actively encourages plan members to use www.deltadentalil.com, including to identify dentists that are in Delta Dental's network.

49. Delta Dental's homepage on www.deltadentalil.com shows how the Website is designed for use by plan members. The homepage provides plan members with "Member Tools" to "Find a Provider" and to "Find a Dentist." The Delta Dental web property permits users to view the search results for in-network providers located near them and to click on the search results. By clicking on a search result for an in-network dentist, the user is transported to the dentist's profile, which they can review to evaluate whether to seek an appointment.

50. Defendant installed tracking technologies offered by LinkedIn on www.deltadentalil.com for marketing purposes.

51. LinkedIn operates a professional networking platform and is one of the largest social networks in the world, boasting over 1 billion members globally.

52. LinkedIn allows users to create profiles that showcase their professional experiences, skills, and education. Those profiles usually include a user's picture, real names, and employment history, among other personal details.

53. LinkedIn also tracks non-users across the web through its widespread Internet marketing products and source code.

54. LinkedIn offers developers different types of cookies to deploy on their websites to track user activity for marketing purposes (collectively, the "LinkedIn Tracking Pixel"). Delta Dental installed JavaScript on www.deltadentalil.com associated with the LinkedIn Tracking Pixel that deployed several cookies on this web property, including li_sugr, UserMatchHistory, lms_ads, lms_analytics, and bcookie.

     a. bcookie is a browser-identifier cookie to uniquely identify devices accessing LinkedIn.

     b. The li_sugr cookie is used to make a probabilistic match of a user's identity in the real world.

     c. The UserMatchHistory is used for ID sync process. It stores the last sync time to avoid repeating the syncing process in a frequent manner.

     d. The lms_ads cookie is used to identify LinkedIn Members off LinkedIn for advertising.

     e. The lms_analytics cookie is used to identify LinkedIn Members off

LinkedIn for analytics.

55.     The code Delta Dental installed on its web property does the following things:

    a.     Without any action or authorization, Delta Dental deposits cookies onto Plaintiff's and other Class Members' computing devices, including the cookies referred to as li_sugr, UserMatchHistory, lms_ads, lms_analytics, and bcookie.

    b.     Without any action or authorization by Plaintiff and other Class Members, the source code on Delta Dental's web property commands Plaintiff's and Class Members' computing devices to contemporaneously re-direct Plaintiff's and Class Members' identifiers and the content of their communications with Delta Dental's web property to this third party.

56.     Delta Dental installed the LinkedIn Tracking Pixel to personally identify plan members who interact with www.deltadentalil.com.

57.     When a plan member interacts with www.deltadentalil.com, Delta Dental uses the plan member's personal identifiers by causing the identifiers to be transmitted to LinkedIn attached to the fact that the plan member has exchanged a communication with Delta Dental and the contents of the communication, including:

    a.     Plan member IP addresses;

    b.     Unique, persistent identifiers that are linked to and can be used to identify the plan member through LinkedIn's "probabilistic matching" technology that can be used to identify online users in the real world;

    c.     Device identifiers; and

d. The specific webpages (*i.e.*, URL(s) the plan member visits, which, in the case of www.deltadentalil.com, include descriptive information regarding the user's use of www.deltadentalil.com and search for dentists through the "Find a Provider" or "Find a Dentist" features.

**B.** ***How Delta Dental Discloses Class Members' Protected Health Information and Assists with Intercepting Communications on https://my.deltadentalcoversme.com/***

58. Delta Dental maintains the web property https://my.deltadentalcoversme.com/ as a healthcare portal for its health plan members to communicate with Delta Dental, including but not limited to exchanging communications about dentists that are in Delta Dental's network.

59. Delta Dental actively encourages plan members to use https://my.deltadentalcoversme.com/, including to identify dentists that are in Delta Dental's network.

60. After a plan member logs into their health portal on https://my.deltadentalcoversme.com/, Delta Dental's landing page shows how the Website is designed for use by plan members. The landing page prompts members to "Find a Dentist" by first inputting their city, zip code, or partial address. Plan members can communicate with Delta Dental that they wish to include additional search parameters to tailor their search by network (*e.g.*, PPO), specialty, dentist type, dentist gender, and dentist language spoken.

61. The Delta Dental web property permits users to view the search results for in-network providers located near them and to click on the search results. By clicking on a search result for an in-network dentist, the user is transported to the dentist's profile, which they can review to evaluate whether to seek an appointment.

62. Defendant installed tracking technologies offered by Google on https://my.deltadentalcoversme.com/ for marketing purposes.

63. By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective category, including the advertising services of Google DoubleClick and Google AdWords.

64. Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[3]

65. Google offers developers different types of cookies to deploy on their websites to track user activity for marketing purposes (collectively, the "Google Tracking Pixel"). Delta Dental installed JavaScript on https://my.deltadentalcoversme.com/ associated with the Google Tracking Pixel that deployed several cookies on this web property. For example, Google explains the following about certain cookies that it uses:

    a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[4]

---

[3] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

[4] Privacy & Terms, Types of Cookies Used by Google, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021). *See also* https://policies.google.com/technologies/cookies?hl=en-GB

b. "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[5]

c. "We use cookies like NID ["Zwieback"] and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[6]

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' ["Biscotti"] and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[7]

e. The _ga cookie, which is typically used to build custom audiences for remarketing or ad targeting.

66. Google connects the identifiers to a person's Google Account and other personal information. Google combines the cookies that Delta Dental sends to Google with the following

---

[5] Privacy & Terms, Types of Cookies Used by Google, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[6] Id.
[7] Id.

other pieces of information in the same systems:

    a.    Google Account ID

    b.    Zwieback ID (the NID cookie sent to Google.com)

    c.    Biscotti ID (the IDE cookie sent to Doubleclick.net)

    d.    IP address

    e.    User-Agent

    f.    Precise Geo-location

    g.    Shipping Address

    h.    Areas of Interest

    i.    PPID

    j.    Device ID

    k.    First Party User ID

    l.    Buy Side Publisher ID

    m.    DUSI

    n.    YouTube Visitor ID

    o.    Credit Card Information

    p.    Age

    q.    Gender

    r.    Race

    s.    Ethnicity

    t.    Income

    u.    Children

67.    Google maps the "CID" data parameter sent through Google Analytics to a person's

Biscotti ID (the IDE cookie sent to Doubleclick.net). Because the Biscotti ID is then correlated to the list of other identifiers above, then so too is the CID data parameter correlated.

68. Google Analytics may also use third-party Google __secure cookies associated with a Google Account when a user is logged into a Google or Gmail Account to track a user on non-Google web sites.

69. The code Delta Dental installed on its web property does the following things:

   a. Without any action or authorization, Delta Dental deposits cookies onto Plaintiff's and other Class Members' computing devices, including the cookies identified in Paragraph 65.

   b. Without any action or authorization by Plaintiff and other Class Members, the source code on Delta Dental's web property commands Plaintiff's and Class Members' computing devices to contemporaneously re-direct Plaintiff's and Class Members' identifiers and the content of their communications with Delta Dental's web property to this third party.

70. Delta Dental installed the Google Tracking Pixel to personally identify plan members who interact with https://my.deltadentalcoversme.com/.

71. When a plan member interacts with https://my.deltadentalcoversme.com/, Delta Dental uses the plan member's personal identifiers by causing the identifiers to be transmitted to Google attached to the fact that the plan member has exchanged a communication with Delta Dental and the contents of the communication, including:

   a. Plan member IP addresses;

   b. Unique, persistent identifiers that are linked to and can be used to identify the plan member;

17

c.      Device identifiers;

d.      The specific webpages (*i.e.*, URL(s) the plan member visits, which, in the case of https://my.deltadentalcoversme.com/, includes descriptive information regarding the fact that a plan member logged in, the user's use of the Website and search for dentists through the "Find a Dentist" features, including their city, zip code, or partial address, their network (e.g., PPO), specialty, dentist type, dentist gender, and dentist language spoken; and

e.      If a plan members selects a specific dentist to evaluate further, the dentist office ID.

***

72.    Delta Dental makes these disclosures, including those identified in Paragraphs 54 and 65, to third-party advertising companies, including LinkedIn and Google, which include the contents of communications between Delta Dental and Class Members, including Plaintiff.

73.    These disclosures include information that identifies Plaintiff and Class Members as Delta Dental plan members and aids the third-parties in receiving and recording plan member communications pertaining to or about in-network dentists.

74.    Class Members, including Plaintiff, do not consent or authorize these interceptions and disclosures.

75.    Delta Dental's third-party disclosures occur because Delta Dental intentionally deploys source code at www.deltadentalil.com and https://my.deltadentalcoversme.com/ that commandeers plan members' web-browsers and causes personally identifiable plan member data, as well as the exact contents of communications exchanged between Delta Dental and Delta Dental plan members, to be sent to third parties.

76. These disclosures occur contemporaneous to the primary communication between Class Members, including Plaintiff, and Delta Dental. By design, the third-party receives and records the exact contents of these communications before the full response from Delta Dental to Plaintiff or a Class member has been rendered on the screen of the plan member's device and while the communication between Delta Dental and plan members remains ongoing.

77. These disclosures are not required or necessary for Delta Dental's website or services to function.

78. Plaintiff will illustrate how the LinkedIn Tracking Pixel operates on Defendant's Websites.

79. Defendant's homepage presently looks like this:



80. Many of the tabs provided by Delta Dental on its web property are directed to plan members—*i.e.*, "Member Tools" and "Find a Provider," among others. Clicking on any of the plan member tabs indicates the person using the web property is a plan member.

81. When the plan member clicks on the link to "Find a Provider" and then clicks "Dental," he is transported to the following webpage: https://www.deltadentalil.com/find-a-provider/dental/



82.     Performing a search for in-network dentists and clicking on a dentist's profile indicates the person is searching for in-network dentists and has selected a dentist's profile to consider as his provider.

83.     When a plan member clicks the tab "Member Tools" or "Find a Provider" or searches for a dentist or clicks on an in-network dentist's profile, Delta Dental re-directs data disclosing the URL the plan member clicked on to LinkedIn.

84.     Simultaneously with the plan member telling Defendant that he would like to "Find a Provider," the descriptive URL, the plan member's IP address, and other unique identifiers (which can be used by LinkedIn to perform a "probabilistic match" to the plan member's identity

in the real world) are surreptitiously transmitted to third-party LinkedIn.

85. When the plan member inputs his search criteria and communicates with Defendant that the plan member wants to find a dentist, Defendant returns the results of the query with information about general dentists within the members' plan located near the member. When the plan member communicates with Defendant that the plan has identified a dentist to evaluate by clicking on a provider profile link, the plan member is transported to the provider's profile page.

86. Here is an example of what the plan member might see.



87. Because Defendant deployed the LinkedIn Tracking Pixel on its Website, the software scripts surreptitiously directed the plan member's browser to send a separate message to

LinkedIn that contained the plan member's communication with Defendant—that the plan member asked Defendant to help him "find a dentist" or to access the dentist's profile information. LinkedIn also received the user's IP address; the type of browser and the type of operating system (called user-agent data); and the time it was sent (called a timestamp).

88. By virtue of the LinkedIn Tracking Pixel, the plan member's browser also shares with Defendant and LinkedIn the cookies identified above in Paragraph 54.

89. Moreover, if a plan member logs into his account on https://my.deltadentalcoversme.com/ prior to searching for a dentist, as Plaintiff did, Google learns that the plan member has logged in and, hence, is an authenticated plan member. In addition, Google learns the details of the plan members' communications with Delta Dental to narrow their search parameters and, if a plan member selects a dentist, Google learns that dentist's office ID. By virtue of the Google Tracking Pixel, the plan member's browser also shares with Defendant and Google the cookies identified above in Paragraph 65.

90. Delta Dental causes multiple data transmissions containing this type of personally identifiable plan member information to be made to LinkedIn and Google contemporaneously with the transmission of the communication to Delta Dental's webserver.

91. The contents of these communications disclose that the individual on the Delta Dental website is a plan member both implicitly (because they identify the individual as someone using the Delta Dental website) and explicitly (because the communications contain reference to the fact that the individual clicked on the e.g., "Member Tools" and "Find a Provider" links and/or because the communication shows the member was authenticated through Defendant's healthcare portal).

92. Delta Dental causes similar data transmissions to be sent to LinkedIn and Google

with every communication that a plan member sends.

93. All of these transmissions are hidden from the plan member. Instead, the plan member only sees the rendered page, without an indication of third-party interception or disclosure.

94. Delta Dental uses the same tools and source code throughout its web property, and the types of personally identifiable plan member data and contents of plan member communications are similar and similarly intercepted and transmitted every time a Delta Dental plan member uses the Delta Dental Websites, regardless of where the plan member goes on the Delta Dental Websites.

95. This is precisely the type of information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of plan members.[8]

96. Plaintiff's and Class Members' identities could be easily determined based on the information that was improperly disclosed.

97. After intercepting and collecting this information, the Tracking Technology Vendors process it, analyze it, and assimilate it into datasets and use it for their own benefit, including to target the plan member with targeted advertising.

98. In other words, the LinkedIn and Google Tracking Pixels allow LinkedIn and Google to know what medical content one of Defendant's plan members communicated with Defendant through Defendant's Websites.

99. Notably, this transmission only occurs on webpages that contain the LinkedIn or Google Tracking Pixels. Thus, Plaintiff's and Class Members' Private Information would not have

---

[8] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Aug. 28, 2024).

been disclosed to the Tracking Technology Vendors but for Defendant's decisions to install the LinkedIn and Google Tracking Pixels on its Websites.

100. By installing and implementing the LinkedIn and Google Tracking Pixels, Defendant caused Plaintiff's and Class Members' communications to be intercepted and transmitted to LinkedIn and Google.

101. Defendant's knowledge is further demonstrated by the fact that Defendant has installed the Facebook Tracking Pixel on its Website, *but* it has truncated and otherwise removed descriptive information from the pages associated with finding a dentist so that the medical information is obscured when it is communicated to Facebook via the Facebook Tracking Pixel. In contrast, Defendant did *not* truncate and otherwise remove descriptive information from the pages associated with finding a dentist so that the medical information is obscured when it is communicated to the Tracking Technology Vendors.

102. Through the LinkedIn and Google Tracking Pixels, Defendant shares its plan members' identities and information related to their private medical treatment.

IV.     *Defendant's Privacy Notices & Promises*

103. Defendant publishes a Privacy Notice on https://www.deltadentalil.com/ that "describes how health information about you may be used and disclosed and how you can get access to this information." (emphasis deleted.)

104. Defendant acknowledges that it "understand[s] that health information about you is personal. We are committed to protecting the confidentiality of your health information that we maintain and using your information appropriately."

105. Defendant further acknowledges "We are required by law to maintain the privacy of your health information[.]"

106. And Defendant agrees "Uses and disclosures of PHI for marketing purposes and disclosures that constitute a sale of PHI require your written authorization."

107. Defendant publishes a Notice of Privacy Practices and Rights on https://my.deltadentalcoversme.com/privacy-policy (together with the Privacy Notice on https://www.deltadentalil.com/, the "Privacy Notices") that similarly "describes the privacy practices of Delta Dental of Illinois and its affiliated companies."

108. Defendant again acknowledges "We understand that health information about you is personal. We are committed to protecting the confidentiality of your health information that we maintain and using your information appropriately" and "Uses and disclosures of PHI for marketing purposes and disclosures that constitute a sale of PHI require your written authorization. Other uses and disclosures of your PHI not covered by this Notice or laws that apply to us will be made only with your written authorization."

109. Defendant's assurances that it will keep plan members' Private Information confidential and secure, are false.

110. Defendant conceals its use of Tracking Technologies to track plan members' personally identifiable information.

111. Defendant violated its own Privacy Notices by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to the Tracking Technology Vendors without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific plan members' consent or authorization to share the Private Information.

## V. *Defendant Violated HIPAA.*

112. Plan member health care information in the United States is protected by federal

law under HIPAA and its implementing regulations, which are promulgated by the HHS.

113. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[9]

114. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

100. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

101. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods

---

[9] HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

and results of the analysis that justify such determination'"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
> ***
> H. Medical record numbers;
> ***
> J. Account numbers;
> ***
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> R. Any other unique identifying number, characteristic, or code…; and
>
> (ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

102. In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), Health and Human Services ("HHS") confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on webpages, such as Delta Dental's use of the Tracking Technologies on its Websites and related subpages.[10] Specifically, HHS explained that "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[11]

103. The HIPAA Privacy Rule requires any "covered entity"—which includes health plans liked Delta Dental—to maintain appropriate safeguards to protect the privacy of protected

---

[10] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept' of Health & Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Privacy Bulletin").
[11] *Id.*

health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

104. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

105. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Delta Dental when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

106. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

i. *Plan member status is among the health information protected by HIPAA*

107. An individual's status as a plan member is protected by HIPAA.

108. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this Information would be PHI.[12]

109.    In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, ***covered entities may not sell lists of patients or enrollees to third parties*** without obtaining authorization from each person on the list. (Emphasis added).[13]

110.    The instructions continue:

For example, it is "marketing" when: . . .  A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

111.    HHS has instructed for decades that patient status – identical to plan member status – is protected by the HIPAA Privacy Rule:

a.    "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.    "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," 67 Fed. Reg. 53186 (Aug. 14, 2002), which includes

---

[12]    https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Aug. 28, 2024).

[13]    https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Aug. 28, 2024).

disclosure of mere status with the covered entity, such a patient or plan member list;

c.  It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

### ii.  *There is no HIPAA exception for marketing on the Internet.*

112.  HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of covered entities, such as health plans, and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Google Analytics," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[14]

113.  In the Bulletin, HHS reminded covered entities that HIPAA applies to covered entities', including health plans', use of tracking technologies like the Tracking Technologies at issue here. Among other things, HHS explained that covered entities, such as health plans, violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

*How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*

Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or

---

[14] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.

IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[15]

114.    Tracking technology vendors like the Tracking Technology Vendors here are

considered business associates under HIPAA if they provide services to Delta Dental and receive

or maintain PHI, as they do:

Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[16]

---

[15] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.  (emphasis added)/
[16] *Id.*

115. HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

Tracking on user-authenticated webpages

Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[17]

116. No PHI may be disclosed to tracking technology vendors like the Tracking Technology Vendors here unless Delta Dental has properly notified its website users and entered into a business associate agreement with the vendor:

Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individual's HIPAA-compliant authorizations are required before the PHI is disclosed to the vendor. Websites banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do not constitute a valid HIPAA authorization.

---

[17] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html. (emphases added.)

[I]t is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure.[18]

## VI.    *Plaintiff's & Class Members' Expectation of Privacy.*

117.    At all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

118.    Plan members are aware of their health plan's duty of confidentiality, and, as a result, have an objectively reasonable expectation that their health plans will not share their personally identifiable data and communications with third parties in the absence of authorization for any purpose that is not directly related or beneficial to the plan member's care.

119.    A recent national survey from CVS-Aetna revealed that "[p]rivacy and data security lead patients' concerns in the changing health environment." Eighty percent of survey respondents "indicated that privacy was a top concern regarding their health care, while 76 percent of individuals felt the same high level of concern for their data security." Both totals are higher than the 73 percent of consumer who indicate that cost is important to their care.

## VII.    *Internet Cookies Are Personally Identifiable*

120.    In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports

---

[18] *Id*.

section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

121. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

122. Cookies are designed to and, in fact, most often do operate as a means of identification for Internet users.

123. Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

124. In general, cookies are categorized by (1) duration and (2) party.

125. There are two types of cookies classified by duration:

    a.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

    b.    "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

126.    Defendant improperly disclosed cookies along with Private Information, including values contained in the li_sugr cookie and cookies associated with the Google Tracking Pixel.

**VIII.    *IP Addresses are Personally Identifiable Information.***

127.    In addition to plan member status, URLs related to the user's efforts to find a medical provider, and other identifiers, such as the li_sugr cookie and cookies associated with the Google Tracking Pixel, Defendant improperly disclosed plan members' computer IP addresses to the Tracking Technology Vendors through the use of the LinkedIn and Google Tracking Pixels.

128.    An IP address is a number that identifies the address of a device connected to the Internet.

129.    IP addresses are used to identify and route communications on the Internet.

130.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

131.    LinkedIn and Google track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

132.    Under HIPAA, an IP address is considered personally identifiable information:

   a.    HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

   b.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also* 45 C.F.R. § 164.514(b)(2)(i)(O).

133. Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the covered entity collects this information through its website or mobile app, it is indicative that the individual has received or will receive health plan services or benefits from the medical provider.[19]

134. Consequently, Defendant's disclosure of plan members' IP addresses violated HIPAA and industry privacy standards.

**IX.** **_Defendant was Unjustly Enriched from the Use of The Tracking Technologies._**

135. The sole purpose of the use of the tracking technologies on Defendant's Websites was marketing and profits.

136. In exchange for disclosing the personally identifiable information of its plan members, Defendant is compensated by the Tracking Technology Vendors in the form of enhanced advertising services and more cost-efficient marketing on LinkedIn and Google.

137. Upon information and belief, Defendant was advertising its services on LinkedIn and Google, and the LinkedIn and Google Tracking Pixels were used to help Defendant market on LinkedIn's and Google's platforms.

138. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

139. Upon information and belief, Defendant re-targeted plan members and potential plan members to get more plan members to use its services.

---

[19] *See* HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaaonline-tracking/index.html (last visited Aug. 28, 2024).

140.     By utilizing the LinkedIn and Google Tracking Pixels, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

**X.      *Plaintiff's and Class Members' Private Information has economic value.***

141.     Defendant and the Tracking Technology Vendors that Defendant uses profit from their use of Plaintiff's and Class member's personal data to target them with advertising and for other economic benefits, such as improving their internal operations.

142.     The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[20] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[21] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

143.     The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[22] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets:

---

[20]     https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[21] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[22] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

"Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[23]

144.     In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[24] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

145.     Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[25]

146.     Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade

---

[23]     https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[24] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

[25] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[26]

147. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[27]

148. The cash value of the personal user information unlawfully collected by Defendant provided during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[28] Web browsing histories were valued at $52.00 per year.

---

[26] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[27] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[28] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039sy our-personal-data-worth.html.



149.     Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

150.     User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important"

for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

151. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

152. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

    a.    Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[29]

    b.    Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[30]

---

[29] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[30] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[31]

d. Killi is a new data exchange platform that allows you to own and earn from your data.[32]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[33]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[34]

---

[31] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[32] https://killi.io/earn/.

[33] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[34] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

153. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[35]

154. In a 2015 study by the Ponemon Institute, researchers determined the value that American Internet users place on their "health condition" as more valuable than any other piece of data about them, with a minimum value of $82.90.22.[36]

155. Medical information derived from medical providers garners even more value from the fact that it is not available to third party data marketing companies because of strict restrictions on provider disclosures under HIPAA, state laws, and health plan standards.

156. Even with restrictions on the disclosure of personally identifiable health information, a robust market exists for the trade of de-identified health data.[37]

157. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things like data and communications. Plaintiff and Class Members have a

---

[35] Kari Paul, *Google launches app that will pay users for their data*, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-proununciations-app.

[36] *See* Ponemon Institute, *Privacy and Security in a Connected Life: A Study of US Consumers*, March 2015, available at https://vdocuments.site/privacy-and-security-in-a-connected-life-protect-personal-information-from-being.html?page=1.

[37] *See* Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, Scientific American, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (February 1, 2016); Sam Thielman, *Your Private Medical Data is for Sale – and It's Driving a Business Worth Billions, The Guardian*, https://www.theguardian.com/technology/2017/jan/10/medical-data-multibillion-dollar-business-report-warns (January 10, 2017); Adam Tanner, *The Hidden Global Trade in Plan member Medical Data*, YaleGlobal Online, https://archive-yaleglobal.yale.edu/content/hidden-global-trade-plan member-medical-data (last visited July 15, 2022).

vested property right in their individually identifiable health information.

158. Illinois courts have described property broadly:

  a. "Property consists of certain rights in things secured by law. These rights are usually defined to be the right of user, the right of exclusion, and the right of disposition. In a strict sense, land is not property, but the subject of property." *Rigney v. City of Chicago*, 102 Ill. 64 (1881).

  b. "Property is the right and interest which one has in lands and chattels to the exclusion of others. The term 'property' includes every species of valuable right and interest. Value is the price deemed or accepted as equivalent to the utility of anything, and compensation is that which constitutes or is regarded as an equivalent. It is impossible to conceive of a thing such as property wholly separated from the element of value. From the very term 'property' the law infers some value; and, if no value is shown, the inference will be that it is the nominal sum of one cent, one penny, or one dollar." *Illinois Cent. R. Co. v. Commissioners of Highways and Town of Mattoon*, 161 Ill. 247, 251 (1896).

159. The United States Supreme Court has explained that, "Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Depriv[ation] of [the] right to exclusive use of … information" causes a loss of property "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id*. at 27. There is no doubt that Delta Dental has a "property right" in plan member data such that, if LinkedIn or Google took such information from Delta Dental without authorization, Delta Dental would have a claim for LinkedIn's or Google's taking of their

property. Plan members also have a property right in their own health information that may not be taken or used by Delta Dental without their authorization for non-health care related reasons.

160.     Federal and state law grant plan members the right to protect the confidentiality of data that identifies them as plan members of a particular health care provider and restrict the use of their health data, including their status as a plan member, to only uses related to their care or otherwise authorized by federal or state law in the absence of plan member authorization.

161.     A plan member's right to protect the confidentiality of their health data and restrict access to it is a valuable right.

162.     In addition to property rights in their health data, plan members enjoy property rights in the privacy of their health communications.

163.     Plan member property rights in their health data and communications are established by HIPAA and state health privacy laws that are equally or more stringent than HIPAA.

164.     American courts have long recognized common law property rights in the content of a person's communications that are not to be used or disclosed to others without authorization.

165.     Property rights in communications and information privacy are established by:

   a.     The Electronic Communications Privacy Act, including Title I (the Wiretap Act); Title II (the Stored Communications Act); and Title III (the Pen Register Act);

   b.     State laws that establish a right to keep communications confidential; and

   c.     Common law information property rights regarding the exclusive use of confidential information that have existed for centuries and continue to exist. *See Folsom v. Marsh*, 9 F.Cas. 342, 346 (C.C.D. Mass. 1841) (Story, J); *Baker v. Libbie*, 210 Mass. 599, 602 (1912); *Denis v. LeClerc*, 1 Mart.

(La.) 297 (1811).

166.     Delta Dental's unauthorized acquisition, use, and disclosure of Plaintiff's and Class Members' individually identifiable health information for marketing purposes violated their property rights to control how their health data and communications are used and who may be the beneficiaries of their data and communications.

167.     Plaintiff and class members seek to recover the value of the unauthorized access to their Private Information resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

168.     Delta Dental does not provide its services for free. All Delta Dental plan members, including Plaintiff, pay Delta Dental premiums either directly or indirectly. When Delta Dental purports to provide its plan members with a modern, convenient and secure means of obtaining its

services, including accessing its in-network provider list, that is an integral part of the services that Delta Dental provides, that has real value. When Delta Dental failed to follow through in providing the promised level of privacy and security, Delta Dental plan members (including Plaintiff) did not receive the full benefit of the bargain that they struck with Delta Dental when they paid for their services.

169. In the modern economy, consumers pay for services with more than money.

170. On the Internet, consumers often pay for services by granting the company with which they are engaged a license to collect and use their personal data for marketing purposes.

171. Although increasing in prevalence due to the Internet, there is nothing novel about such arrangements. Bartering occurred prior to the invention of currency. The exchange of a data license for use of a service is a modern-day bartering arrangement.

172. Thus, although certain services do not involve the payment of money, they are not free. Consumers pay for the services by giving a license to use their data instead.

173. The right to collect and use consumer data is valuable and monetizable—by companies and consumers. This is particularly true of health information.

174. On the surface, the price of Delta Dental's health plan services includes the payments that users made to Delta Dental. But what Delta Dental failed to disclose to plan members is that it was also granting itself a license to collect, disclose to third-parties, and use their health information for Delta Dental's own benefit, including for marketing purposes.

175. In signing up to become a Delta Dental plan member, Plaintiff and Class Members granted Delta Dental a license to use their information and communications content that was limited to the purposes listed in the Privacy Notices. As described herein, that disclosure does not extend to the disclosure of their protected health information. Thus, the limits of the data license

that Delta Dental obtains in order to provide health services to plan members is prescribed by the Privacy Notices and did not include using, disclosing, or selling plan member information for marketing purposes.

176.     Delta Dental overcharged plan members by granting itself a license to use and disclose valuable plan member health data beyond the license and limitations specifically stated in the Privacy Notices.

177.     The "data license" overcharge that Delta Dental collects, uses, and shares for marketing purposes without authorization has monetary value. For example, a 2015 study found respondents placed a value of $59.80 on health information.

178.     In addition, some companies sell de-identified health information in the open market. For example, a company named Prognos Health provides a data platform where it purports to sell information from "more than 325 million de-identified plan members."

179.     Because Americans typically do not want to sell their personal health information for any purpose and it is illegal to even share such information without express, written authorization, there are fewer open markets for a license to collect or sell personal health information for non-health purposes than other types of data. However, black markets do exist for such data. It has been reported that health data can be "more expensive than stolen credit card numbers" on black markets.

**REPRESENTATIVE PLAINTIFF'S EXPERIENCES**

180.     Plaintiff interacted with Delta Dental's Website located at: www.deltadentalil.com.

181.     Plaintiff logged into the healthcare portal and interacted with Delta Dental's Website located at: https://my.deltadentalcoversme.com/.

182.     Plaintiff exchanged communications with Delta Dental via these web properties,

including identifying himself to Delta Dental as a plan member, exchanging communications relating to his status as a plan member, and searching for and identifying in-network medical providers.

183.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his personally identifiable information and protected health information; nor did he authorize any assistance with intercepting his communications. Despite this, Defendant knowingly disclosed Plaintiff's protected health information to the Tracking Technology Vendors.

184.     By law, Plaintiff is entitled to privacy in his protected health information and confidential communications. Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed plan members' protected information to the Tracking Technology Vendors – an unauthorized third-party eavesdropper; and (iii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

185.     Plaintiff did not discover that Defendant disclosed his personally identifiable information and protected health information to the Tracking Technology Vendors, and assisted those Providers with intercepting their communications, until approximately shortly before this Complaint was filed.

186.     Plaintiff maintains Delta Dental insurance coverage and anticipates needing to use the Member services available on Defendant's Websites, including to search for medical providers.

**TOLLING**

187. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his Private Information was intercepted and unlawfully disclosed because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

188. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

189. The Class that Plaintiff seeks to represent is defined as follows:

**All individuals residing in the State of Illinois whose Private Information was disclosed to a third party without authorization or consent through the tracking technologies on Defendant's Websites.**

190. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

191. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

192. **Numerosity, Fed R. Civ. P. 23(a)(1)**. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least thousands of individuals whose PII and PHI may have been improperly accessed by the Tracking Technology Vendors, and the Class is identifiable within Defendant's records. The majority of those class members are believed to be Illinois residents.

193. **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant violated its Privacy Notices by disclosing the PII and PHI of Plaintiff and Class Members to LinkedIn, Google, and/or additional third parties.

d. Whether Defendant adequately, promptly and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h. Whether Defendant violated the statutes invoked herein;

i. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.      Whether Defendant knowingly made false representations in its Privacy Notices;

k.      Whether Defendant knowingly omitted material representations with respect to its Privacy Notices; and

l.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

194.    **Typicality, Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of the Tracking Technologies, due to Defendant's misfeasance.

195.    **Adequacy, Fed. R. Civ. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

196.    **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require.

Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Delta Dental, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

197. **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

198. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

199. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

200. **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

201. **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Defendant will continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

202. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

    b.    Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's Privacy Notices;

c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I.**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510 *et seq*.**
**On Behalf of Plaintiff and the Class**

203. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

204. The ECPA protects both the sending and receipt of communications.

205. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

206. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other

person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

207. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

208. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

209. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

210. An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

211. Plaintiff and Class Members' interactions with Delta Dental's web properties and their online communications with Delta Dental are electronic communications under the ECPA.

212. Whenever Plaintiff and Class Members interacted with Delta Dental's web properties, Delta Dental, through the source code it embedded and ran on its web properties, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class Members' electronic communications without authorization or consent.

213. Whenever Plaintiff and Class Members interacted with Delta Dental's web properties Delta Dental, through the source code it embedded and ran on its web properties, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including LinkedIn and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

214. Whenever Plaintiff and Class Members interacted with Delta Dental's web properties Delta Dental, through the source code it embedded and ran on its web properties, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health plan services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

215. Whenever Plaintiff and Class Members interacted with Delta Dental's web properties Delta Dental, through the source code it embedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including LinkedIn and Google.

216. Whenever Plaintiff and Class Members interacted with Delta Dental's web properties Delta Dental, through the source code it embedded and ran on its web properties, contemporaneously and intentionally divulged the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or

entities other than an addressee or intended recipient of such communication, including LinkedIn and Google.

217. Delta Dental intentionally intercepted and used the contents of Plaintiff's and Class Members' electronic communications for the unauthorized purpose of disclosing and, on information and belief, profiting from, Plaintiff's and Class Members' communications by selling the contents to third parties including LinkedIn and Google.

218. Plaintiff and Class Members did not authorize Delta Dental to acquire the content of their communications for purposes of sharing and selling the personal information contained therein.

219. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

220. Delta Dental is a "party to the communication" with respect to plan member communications.

221. Delta Dental's acquisition of plan member communications that were used and disclosed to LinkedIn and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and of Illinois, including:

 a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

 b. Violation of the Illinois Computer Fraud Act, 720 ILCS 5/17-50;

 c. Violation of the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51; and

 d. Violation of the Illinois Deceptive Trade Practices Act, 815 ILCS §§ 510/2, *et seq.*

222. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the plan member.

223. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

224. Delta Dental's conduct violated 42 U.S.C. § 1320d-6 in that it:

    a.    Used and caused to be used cookies associated with specific plan members, including li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie and cookies associated with the Google Tracking Pixel, without plan member authorization;

    b.    Disclosed individually identifiable health information to LinkedIn and Google.

225. Delta Dental's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Delta Dental's use of the LinkedIn and Google source code was for Delta Dental's commercial advantage to increase revenue from existing plan members and gain new plan members.

226. Under 720 ILCS, 17-50, "[a] person commits computer fraud when he or she knowingly:

    a.    Accesses or causes to be accessed a computer or any part therefor, or a program or data, with the intent of device or executing any scheme or artifice to defraud, or as part of a deception;

b. Obtains use of, damages, or destroys a computer or any part thereof, or alters, deletes, or removes any program or data contained therein, in connection with any scheme or artifice to defraud, or as part of a deception; or

c. Access or causes to be accessed a computer or any part thereof, or a program or data, and obtains money or control over any such money, property, or services of another in connection with any scheme or artifice to defraud, or as part of a deception.

227. Delta Dental's conduct violated the Illinois Computer Fraud Act in that:

a. Delta Dental accessed Plaintiff's and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and cookies associated with the Google Tracking Pixel as well as use of source code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with Delta Dental simultaneously to Delta Dental and LinkedIn and Google;

b. Delta Dental obtained use of and/or removed data from Plaintiff's and Class Members' computing devices as part of a deception and without their authorization, including through placement, use, and removal of the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel as well as use of source code that commanded Plaintiff's and Class Members' computing devices to

send identifiers and the content of communications with Delta Dental simultaneously to Delta Dental and LinkedIn and Google;

c. Delta Dental accessed or caused to be accessed the Plaintiff's and Class Members' computing devices and data, and thereby obtained control over the Plaintiff's and Class Members' property in the form of their computing devices and right to control access and use of their personal health information as part of a deception and without their authorization, including through placement of the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel as well as the use of source code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communication with Delta Dental simultaneously to LinkedIn and Google.

228. The Illinois Computer Crime Prevention Law ("ICCPL") prohibits "computer tampering," and provides a private right of action for whoever "suffers loss by reason of a violation of subdivision (a)(4)." 720 ILCS 5/17-51(c).

229. Subdivision (a)(4) of the ICCPL provides: a) A person commits computer tampering when he or she knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her: … (4) Inserts or attempts to insert a program into a computer or computer program knowing or having reason to know that such program contains information or commands that will or may… (b) alter, delete, or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently

accessing or being accessed by that computer; or (c) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program…

230. Delta Dental violated the ICCPL when it knowingly and without Plaintiff's or Class Members' authorization inserted the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel on Plaintiff's and Class Members' computing devices.

231. The li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Delta Dental to LinkedIn and Google.

232. Delta Dental knew or had reason to know that the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Delta Dental to LinkedIn and Google.

233. Delta Dental knew or had reason to know that its use of the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel would cause Plaintiff and Class Members to suffer a loss, including:

      a. The interruption or preclusion of Plaintiff's and Class Members' ability to communicate with their health plan on their health plan's websites;

      b. The diminution in value of Plaintiff's and Class Members' protected health information;

c.      Plaintiff's and Class Members' inability to use their computing devices for the purpose of communicating with their health plan;

d.      The loss of privacy due to Delta Dental making sensitive and confidential information such as plan member status and searching for in-network providers Plaintiff and Class Members intended to remain private no longer private; and

e.      Delta Dental took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

234.    Delta Dental's acquisition of plan member communications that Delta Dental used and disclosed to LinkedIn and Google was done in violation of the Illinois Deceptive Trade Practices Act, as alleged below.

235.    Delta Dental's acquisition of plan member communications that Delta Dental used and disclosed to LinkedIn and Google was done for purposes of committing trespass to chattels, as alleged below, in that it was accomplished through source code that cause LinkedIn and Google cookies (including but not limited to the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel) to be deposited on Plaintiff's and Class Members' computing devices as "first-party" cookies that are not blocked.

236.    As a direct and proximate result of Delta Dental's violation of the ECPA, Plaintiff and Class Members were damaged by Delta Dental's conduct in that:

a.      Delta Dental harmed Plaintiff's and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no more;

c. Delta Dental eroded the essential confidential nature of the plan-plan member relationship;

d. Delta Dental took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class Members did not get the full value of the services for which they paid, which included Delta Dental's duty to maintain confidentiality; and

f. Delta Dental's actions diminished the value of Plaintiff and Class Members' personal information.

237. Plaintiff, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II.**
**BREACH OF THE IMPLIED DUTY OF CONFIDENTIALITY**
**On Behalf of Plaintiff and the Class**

238. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

239. Plaintiff and Class Members were plan members of Delta Dental and received services from Delta Dental.

240. As part of establishing and continuing the services provider/plan member relationship between Delta Dental and its plan members, including Plaintiff and Class Members, Delta Dental agreed to keep Plaintiff's and Class Members information confidential.

241. There is a duty of confidentiality implied in every health care service provider and plan member relationship, akin to an implied contract, such that health plan services providers may not disclose confidential information acquired through the health care health plan-plan member relationship. *See, e.g.*, *Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 438 (1979).

242. The implied duty of confidentiality is at least as extensive as Delta Dental's statutory obligations as a health plan to maintain plan member confidentiality.

243. Delta Dental is obligated to protect the confidentiality of plan member information under HIPPA.

244. Delta Dental also may not disclose personally identifiable information about a plan member, potential plan member, or household member of a plan member for marketing purposes without the plan member's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

245. HIPAA preempts any state law that is less protective of plan member privacy.

246. To the extent the Court determines that Illinois state law is less protective of plan member privacy than HIPAA, then that Illinois law is pre-empted by HIPAA.

247. Delta Dental's web properties link to HIPAA Privacy Notices that acknowledge Delta Dental's duty of confidentiality, including assuring Plaintiff and Class Members that Delta Dental will protect the confidentiality of their data and communications. The Privacy Notices further assure Plaintiff and Class Members that Delta Dental will not use their data and communications for marketing purposes without express written authorization.

248. Delta Dental provided its HIPAA Privacy Notices to Plaintiff and all Delta Dental plan members.

249. The HIPAA Privacy Notices is incorporated by reference into the Terms and Conditions and/or Terms of Use that Delta Dental makes a condition of using its web properties.

250. Plaintiff and Class Members performed all required conditions of their implied contracts with Delta Dental.

251. Delta Dental breached the implied duty of confidentiality to Plaintiff and Class Members by intentionally deploying source code at its web properties that caused the transmission of personally identifiable plan member data and communications to third parties including LinkedIn and Google.

252. As a direct and proximate result of Delta Dental's breach of the implied duty of confidentiality, Plaintiff and Class Members were damaged in that:

    a.    Delta Dental harmed Plaintiff's and Class Members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no more;

    c.    Delta Dental eroded the essential confidential nature of the health plan-plan member relationship;

    d.    Delta Dental took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class Members did not get the full value of the plan services for which they paid, which included Delta Dental's duty to maintain the confidentiality of their plan member information; and

f. Delta Dental's actions diminished the value of Plaintiff's and Class Members' personal information.

### COUNT III.
### VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS §§ 510/2, *et seq*.
### On Behalf of Plaintiff and the Class

253. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

254. Delta Dental is a "person" as defined by 815 ILCS § 510/1(5).

255. Delta Dental engaged in deceptive trade practices in the conduct of its business, in violation of 815 ILCS § 510/2(a), including:

a. Representing that goods or services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising goods or services with intent not to sell them as advertised; and

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

256. Delta Dental's practice of disclosing Plaintiff's and Class Members' personally identifiable data and re-directing their communications to third parties without authorization, consent, or knowledge is a deceptive trade practice, in violation of 815 ILCS § 510/2(a).

257. Delta Dental's practice of disclosing Plaintiff's and Class Members' personally identifiable data and re-directing their communications to third parties without authorization, consent, or knowledge was willful.

258. Delta Dental's practice of disclosing Plaintiff's and Class Members' personally identifiable data and re-directing their communications to third parties without authorization, consent, or knowledge was intentional.

259. Delta Dental's representations and omissions were material because they were likely to deceive reasonable consumers about the privacy, security, and use of their personally identifiable plan member data and communications when using the Delta Dental web properties.

260. The above unfair and deceptive practices and acts by Delta Dental were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and the Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

261. As a direct and proximate result of Delta Dental's unfair, unlawful, and deceptive trade practices, Plaintiff and the Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including overpaying for Delta Dental's health care services; and loss of value of their personally identifiable plan member data and communications.

262. As a direct and proximate result of Delta Dental's unfair, unlawful, and deceptive acts and practices, Plaintiff and the Class Members were also damaged by Delta Dental's conduct in that:

    a.     Delta Dental harmed Plaintiff's and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no more;

c. Delta Dental eroded the essential confidential nature of the health plan-plan member relationship;

d. Delta Dental took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Delta Dental's duty to maintain confidentiality; and

f. Delta Dental's actions diminished the value of Plaintiff and Class Members' personal information.

263. Plaintiff and the Class Members are plan members of Delta Dental and need access to Delta Dental's web properties, including www.deltadentalil.com and its healthcare portal https://my.deltadentalcoversme.com/, in connection with receiving plan benefits from Delta Dental. Because Plaintiff and Class Members need to, and so will continue to use Delta Dental's web properties in the future, if Delta Dental's unfair, unlawful, and deceptive trade practices are allowed to continue, Plaintiff and Class Members are likely to suffer continuing harm in the future.

264. Plaintiff and the Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

**COUNT IV.**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS §§ 505/1, *et seq*.**

**On Behalf of Plaintiff and the Class**

265. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

266. Delta Dental is a "person" as defined by ILCS § 505/1(c).

267. Plaintiff and the other Class Members are "consumers" as defined by 815 ILCS § 505/1(e).

268. Delta Dental's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS § 505/1(f).

269. Delta Dental's unfair acts and practices against Plaintiff and the other Class Members occurred in the course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals in Illinois.

270. Plaintiff and Class Members received and paid for health plan services from Delta Dental.

271. Plaintiff and Class Members used Delta Dental's web properties, in connection with receiving health plan services from Delta Dental.

272. Plaintiff's and Class Members' payments to Delta Dental for health plan services were for household and personal purposes.

273. Delta Dental's practice of disclosing Plaintiff's and Class Members' personally identifiable data and re-directing their communications to third parties without authorization, consent, or knowledge is a deceptive, unfair, and unlawful trade act or practice, in violation of 815 ILCS § 505/2. 359. Delta Dental's unfair business practices were targeted at all Delta Dental plan members, including Plaintiff and the other Class Members.

274. Delta Dental's representations and omissions were material because they were likely to deceive reasonable consumers about the privacy, security, and use of their personally identifiable plan member data and communications when using the Delta Dental web properties.

275. Delta Dental intended to mislead Plaintiff and the other Class Members and induce them to rely on its misrepresentations and omissions.

276. Delta Dental's surreptitious collection and disclosure of Plaintiff's and Class Members' personally identifiable data and communications to third parties involves important consumer protection concerns.

277. Plaintiff and the Class Members were injured and have suffered damages as a direct and proximate result of Delta Dental's unfair acts and practices.

278. Plaintiff's and the Class Members' injuries were proximately caused by Delta Dental's unfair and deceptive business practices.

279. As a result of Delta Dental's conduct, Delta Dental has been unjustly enriched.

280. The above unfair and deceptive practices and acts by Delta Dental were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and the Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

281. As a direct and proximate result of Delta Dental's unfair, unlawful, and deceptive trade practices, Plaintiff and the Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including overpaying for Delta Dental's health care services, and loss of value of their personally identifiable plan member data and communications.

282. As a direct and proximate result of Delta Dental's unfair, unlawful, and deceptive acts and practices, Plaintiff and the Class Members were also damaged by Delta Dental's conduct in that:

    a.    Delta Dental harmed Plaintiff's and Class Members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and the Class Members intended to remain private is no more;

    c.    Delta Dental eroded the essential confidential nature of the health plan-plan member relationship;

    d.    Delta Dental took something of value from Plaintiff and the Class Members and derived benefit therefrom without Plaintiff's and the Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    e.    Plaintiff and the Class Members did not get the full value of the medical services for which they paid, which included Delta Dental's duty to maintain confidentiality; and

    f.    Delta Dental's actions diminished the value of Plaintiff and the Class Members' personal information.

283. The relief requested by Plaintiff and the other Class Members, would provide redress for the harms Delta Dental caused not just to Plaintiff, but to all other Class Members.

284. Plaintiff and the Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

**COUNT V.**
**TRESPASS TO CHATTELS**
**On Behalf of Plaintiff and the Class**

285. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

286. Plaintiff and Class Members owned, leased, or controlled their computing devices from which they communicated with Delta Dental.

287. As set forth below, Delta Dental intentionally used, intermeddled, interfered with, and dispossessed Plaintiff's and Class Members' of their computing devices without their consent by placing the li_sugr, UserMatchHistory, lms_ads, lms_analytics and/or bcookie cookies and/or cookies associated with the Google Tracking Pixel on Plaintiff's and Class Members' computing devices, which caused Plaintiff and Class Members to suffer damages

288. The source code deployed by Delta Dental on its web properties is designed such that, when Plaintiff and other Class Members visit the Delta Dental web properties, cookies associated with LinkedIn and Google are deposited on their communications devices.

289. Plaintiff and Class Members did not consent to Delta Dental using source code that places cookies associated with LinkedIn and Google on their devices.

290. Delta Dental's placement of LinkedIn and Google cookies is the modern equivalent of placing a bug in someone's telephone or on the desk where their computer sits. The LinkedIn and Google source code and cookies deployed by Delta Dental have taken the place of the "bug," which is why these tools are often called "web bugs."

291. Plaintiff and Class Members computing devices derive substantial value from their ability to facilitate communications with their health plan, which is integral to the intended function of their devices.

292. Delta Dental's setting of LinkedIn and Google cookies results in the persistent and unavoidable interception of Plaintiff's and Class Members' communications, which deprives

Plaintiff and Class Members of the full value of using their computing devices for those communications.

293. Plaintiff's and Class Members' devices are useless for exchanging private communications with Delta Dental, which substantially impairs the condition, quality, and value of Plaintiff's and Class Members' computing devices.

294. Delta Dental's trespass onto Plaintiff's and Class Members' computing devices caused them the following damages:

    a.    Nominal damages for trespass;

    b.    The total deprivation of their use of their computing devices to privately communicate with Delta Dental.

295. For Delta Dental's trespass, Plaintiff and Class Members seek nominal damages, actual damages, general damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

**COUNT VI.**
**BREACH OF CONTRACT**
**On Behalf of Plaintiff and the Class**

296. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

297. Delta Dental requires plan members who interact with its web properties to agree to "Terms and Conditions" and/or "Terms of Use," which incorporate the Privacy Notices.

298. The "Terms and Conditions" and/or "Terms of Use" are binding contracts on Delta Dental.

299. As described herein, Delta Dental breaches these contractual promises by failing to keep confidential Plaintiff's and its plan members' protected health information.

300.     As a direct and proximate result of Delta Dental's breaches of contract, Plaintiff and Class Members did not receive the full benefit of the bargain of their contract with Delta Dental in that Delta Dental overcharged Plaintiff and Class Members by collecting data in excess of the "data license" that was agreed upon in the contract between Plaintiff and Class Members and Delta Dental in the Privacy Notices. Specifically, as set forth above, Delta Dental expressly promised that its "data license" would not include the divulgence or sale of Plaintiff's and Class Members' confidential health information.

301.     As a direct and proximate result of Delta Dental's breaches of contract, Plaintiff and the Class Members suffered the following damages:

    a.    Nominal damages;

    b.    The interruption of Plaintiff's and Class Members' ability to communicate with their health plan on Delta Dental's web properties in private;

    c.    The diminution in value of Plaintiff's and Class Members' protected health information;

    d.    Plaintiff's and Class Members' inability to use their computing devices for the purpose of communicating with their health plan;

    e.    The loss of privacy due to Delta Dental making sensitive and confidential information such as plan member status and communications that Plaintiff and Class Members intended to remain private no longer private;

    f.    Delta Dental took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value; and

g.     The deprivation of the benefit of the bargain in the Delta Dental's contract stated that the data license for its services did not include the divulgence or sale of their confidential health information, but Delta Dental took more data than the contractually agreed-upon amount.

302. For Delta Dental's breaches of contract, Plaintiff and Class Members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

**COUNT VII.**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**On Behalf of Plaintiff and the Class**

303. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

304. A valid contract exists between Delta Dental and each of the Plaintiff and Class Members.

305. A duty of good faith and fair dealing is implied in every contract.

306. The duty of good faith and fair dealing obligates the parties to a contract to cooperate with each other so that each may obtain the full benefit of performance.

307. The duty of good faith and fair dealing also arises when the contract gives one party discretionary authority to determine a contract term.

308. Delta Dental has discretionary authority to determine the meaning of its Terms of Use and Terms and Conditions, including the terms governing Delta Dental's maintenance of the privacy, confidentiality, and security of plan members' confidential health information.

309. Delta Dental abused its power to define terms of the contract between Delta Dental and plan members, including:

a. The meaning of the term "use, disclose, and protect such HIPAA Protected Health Information in accordance with our Notice of Privacy Practice"

b. The meaning of the term "Only the website can read the 'cookie'; we cannot read 'cookies' sent by other websites.

310. Delta Dental did not act fairly and good faith.

311. Rather than maintaining Plaintiff's and Class Members' confidential health information in accordance with HIPAA, Delta Dental disclosed Plaintiff's and Class Members' confidential health information to LinkedIn and Google, and other third parties.

312. Rather than taking steps to make sure that only Delta Dental could read the cookies and that cookies could not be read by other websites, Delta Dental designed its web properties to deploy third-party tracking technologies that caused Plaintiff's and Class Members' to be redirected and intercepted by third-party marketing companies.

313. Rather than refraining from using or disclosing Plaintiff's and Class Members' health information for marketing without their consent, Delta Dental did the exact opposite and divulged health information to LinkedIn and Google, and other advertisers.

314. Rather than requesting Plaintiff's and Class Members' authorization for certain marketing activities, including activities that involve the sale of their Protected Health Information, Delta Dental disclosed Plaintiff's and Class Members' protected health information to third-party marketing companies without their knowledge, consent, or authorization.

315. In doing so, Delta Dental frustrated and undercut Plaintiff's and Class Members' contractual rights, and unfairly interfered with Plaintiff's and Class Members' rights under the parties' contract.

316. As a direct and proximate result of Delta Dental's breaches, Plaintiff and Class Members did not receive the full benefit of the bargain of their contract with Delta Dental in that Delta Dental overcharged Plaintiff and Class Members by collecting data in excess of the "data license" that was agreed upon in the contract between Plaintiff and Class Members and Delta Dental in the Privacy Notices and the Terms and Conditions and Terms of Use. Specifically, as set forth above, Delta Dental expressly promised that its "data license" would not include the divulgence or sale of Plaintiff's and Class Members' confidential health information.

317. As a direct and proximate result of Delta Dental's breaches of the duty of good faith and fair dealing, Plaintiff and the Class Members suffered the following damages:

a. Nominal damages;

b. The interruption of Plaintiff's and Class Members' ability to communicate with their health plans on Delta Dental's web properties in private;

c. The diminution in value of Plaintiff's and Class Members' protected health information;

d. Plaintiff's and Class Members' inability to use their computing devices for the purpose of communicating with their health plans;

e. The loss of privacy due to Delta Dental making sensitive and confidential information such as plan member status and communications that Plaintiff and Class Members intended to remain private no longer private;

f. Delta Dental took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value; and

g. The deprivation of the benefit of the bargain in the Delta Dental's contract stated that the data license for its services did not include the divulgence or sale of their confidential health information, but Delta Dental took more data than the contractually agreed-upon amount.

318. For Delta Dental's breaches of the duty of good faith and fair dealing, Plaintiff and Class Members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

## COUNT VIII.
## QUASI-CONTRACT
**(Pleaded in the alternative to breach of contract and breach of good faith and fair dealing)**
**On Behalf of Plaintiff and the Class**

319. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

320. Delta Dental has wrongfully and unlawfully transmitted Plaintiff's and Class Members' individually identifiable health information without their consent.

321. Plaintiff's and Class Members' individually identifiable health information conferred an economic benefit on Delta Dental.

322. Delta Dental has been unjustly enriched at the expense of the Plaintiff and Class Members.

## COUNT IX.
## VIOLATION OF THE ILLINOIS EAVESDROPPING STATUTE
## 720 ILCS § 5/14-1, *et seq.*
**On Behalf of Plaintiff and the Class**

115. The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, *et seq.*, prohibits the surreptitious interception, recording, or transcription of private electronic communications without the consent of all parties to the conversation and provides a civil cause of action to a person

subjected to a violation of the IES against eavesdroppers and their principals.

323. Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication.

324. Under 720 ILCS § 5/14-2(a)(5), the IES makes it unlawful for a person to knowingly and intentionally use or disclose any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the IES, unless he or she does so with the consent of all of the parties.

325. Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

326. The IES defines "private electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS § 5/14-1(e).

327. "Surreptitious," as used in the IES, "means obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS § 5/14-1(g).

328. An "eavesdropper" means "any person…who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the IES] or who acts as a principal[.]" 720 ILCS § 5/14-1(b).

329. A "principal" includes any person who "[k]owingly derives any benefit or information from the illegal use of an eavesdropping device by another" or "[d]irects another to use an eavesdropping device illegally on his or her behalf." 720 ILCS § 5/14-1(c).

330. An "eavesdropping device" is "any device capable of being used to…intercept…electronic communications[.]" 720 ILCS § 5/14-1(a).

331. Plaintiff's communications with Delta Dental constituted private electronic communications. Plaintiff transmitted their communications to Delta Dental from their computers or by wire, intended the communications to be private, and reasonably expected the communications to be private under HIPAA, Delta Dental's express promises of confidentiality, the plan-plan member relationship, and other State and federal laws protecting the confidentiality of Plaintiff's communications.

332. LinkedIn and Google were not parties to Plaintiff's private electronic communications with Delta Dental. Plaintiff believed they were only communicating with Delta Dental, intended for their communications to be directed at Delta Dental only, and were unaware of the presence of concealed source code that redirected their communications.

333. LinkedIn and Google's interceptions of Plaintiff's private electronic communications were knowing, intentional, and surreptitious. LinkedIn and Google intentionally designed their source code so that it could be concealed on websites to secretly intercept private communications. On information and belief, LinkedIn and Google knew that their source code was

capable of, and in fact did, intercept private electronic communications without the consent of all parties to the communications.

334. LinkedIn and Google used and disclosed Plaintiff's intercepted communications for advertising purposes.

335. LinkedIn's and Google's conduct was done without Plaintiff's consent, in violation of 720 ILCS § 5/14-2(a)(3) and (a)(5).

336. Delta Dental acted as LinkedIn's and Google's "principal" under the IES. By deploying the source code from LinkedIn and Google on its web-property, Delta Dental directed that LinkedIn and Google illegally eavesdrop on Plaintiff's private electronic communications on its behalf and Delta Dental knowingly derived benefits and information from the illegal eavesdropping in the form of marketing.

337. Delta Dental further violated 720 ILCS § 5/14-2(a)(4) by possessing the source code, knowing that its design rendered it primarily useful for surreptitiously intercepting private electronic communications contrary to the IES.

338. Delta Dental's violation of the IES was wanton, reckless, and/or malicious.

339. For Delta Dental's violations of the IES, Plaintiff and Class Members seek actual damages, punitive damages, injunctive relief, and any other relief the Court deems just.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class Members, respectfully requests relief against Delta Dental as set forth below:

a. Entry of an order certifying the proposed Class and Class pursuant to Federal Rules of Civil Procedure;

b. Entry of an order appointing Plaintiff as representatives of the Class;

c. Entry of an order appointing Plaintiff's counsel as Class Counsel for the Class;

d. Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

    i. Enjoining Delta Dental, its affiliates, associates, officers, employees and agents from transmitting or disclosing Plaintiff's and Class Members' personally identifiable plan member data and the contents of their communications to unauthorized third parties;

    ii. Enjoining Delta Dental, its affiliates, associates, officers, employees and agents from taking Plaintiff's and Class Members' personally identifiable plan member data and the contents of their communications, and any other data except that for which appropriate notice and consent is provided;

    iii. Mandating that Delta Dental, its affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all the above steps have been taken; and

    iv. Mandating that Delta Dental, its affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiff in the form of a declaration under oath that the above steps have been satisfied.

e. Enter judgment in favor of Plaintiff and each of the other Class Members for damages suffered as a result of Delta Dental's conduct alleged herein, including compensatory, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

f. Award Plaintiff their reasonable attorneys' fees and costs; and

g.   Grant such other and further legal and equitable relief as the court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  October 7, 2024                        DWOSKIN WASDIN LLP

_s/  Eric Dwoskin_____
Eric S. Dwoskin
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorney for Plaintiff and the putative Class*